**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DISH NETWORK CORPORATION; DISH NETWORK, L.L.C.,
    *Plaintiffs-Appellants,*

v.

FEDERAL COMMUNICATIONS COMMISSION; JULIUS GENACHOWSKI; MICHAEL J. COPPS; ROBERT M. MCDOWELL; MIGNON CLYBURN; MEREDITH ATTWELL-BAKER; UNITED STATES OF AMERICA,
    *Defendants-Appellees.*

No. 10-16666

D.C. No. 2:10-cv-01075-JCM-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
January 13, 2011—San Francisco, California

Filed February 24, 2011

Before: J. Clifford Wallace, Barry G. Silverman, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

2853

## COUNSEL

Courtney J. Linn, Orrick, Herrington & Sutcliffe LLP, Sacramento, California; E. Joshua Rosenkranz (argued), Orrick, Herrington & Sutcliffe, LLP, New York, New York for plaintiffs-appellants DISH Network Corporation and DISH Network, L.L.C.

Tony West, Assistant Attorney General; Daniel G. Bogden, United States Attorney; Mark B. Stern (argued) and Dina B. Mishra, Department of Justice, Washington, D.C. for defendants-appellees Federal Communications Commission, Julius Genachowski, Michael J. Copps, Robert M. McDowell, Mignon Clyburn, Meredith Attwell-Baker, United States of America.

# OPINION

TALLMAN, Circuit Judge:

DISH Network Corporation and DISH Network, LLC (collectively "DISH") appeal the district court's order denying DISH's motion for a preliminary injunction. DISH argues that it is likely to succeed in its argument that § 207 of the Satellite Television Extension and Localism Act of 2010 (STELA), Pub. L. No. 111-175, § 207, 124 Stat. 1218 (amending 47 U.S.C. § 338 (2006)), which accelerates the timetable under which satellite providers that carry local stations in high-definition (HD) format in a particular market must carry "qualified noncommercial educational television stations" in HD, is a content-based regulation of free speech in violation of the First Amendment. DISH asserts that the statute interferes with its editorial discretion and judgment by forcing it to delay offering commercial programming in HD to certain markets. That delay, DISH argues, forces DISH subscribers to receive Public Broadcasting Service (PBS)[1] programs in HD before commercial programs, even though they "prefer watching the World Cup and American Idol in vivid colors over Jim Leher and Elmo."

Because we agree with the district court that DISH failed to demonstrate it is likely to succeed on the merits, we affirm the denial of injunctive relief. *See Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 381 (2008).

# I

It is helpful first to briefly review how satellite television works, why it is regulated, and how § 207 came to be enacted. There are only two major Direct Broadcast Satellite providers

---

[1] The statute in question applies to all local public television stations. While the majority of public television consists of PBS programming, much of the content is locally produced.

2858 DISH NETWORK CORP. v. FCC

in the United States: DirectTV, which has about 18.5 million subscribers, and DISH, which has about 14.1 million subscribers. They rely on assigned radio frequency bands to transmit signals to consumers from satellites located at designated orbital locations in space. The transmissions are governed by the Federal Communications Commission (FCC) and international regulations.

The United States has been assigned eight orbital locations for providing satellite service. Each location is divided into 32 satellite channels. Transmissions from satellites in the same orbital location may cause signal interference, so Congress has authorized the FCC to grant licenses to satellite service providers assigning them the use of specified channels at particular orbital locations. The licenses are limited in duration and the FCC may grant or renew them only if doing so will serve the public interest, convenience, or necessity. 47 U.S.C. § 307.

In 1999, Congress created an exception to copyright law to better enable competition between satellite TV and cable TV. The Satellite Home Viewer Improvement Act of 1999 (SHVIA) amended the Copyright Act to create statutory copyright licenses for satellite carriers that allow them to retransmit a local broadcast station's signal without first getting permission from the individual copyright holders. The copyright license is also subject to statutory and regulatory conditions.

As a condition of their licenses, carriers have certain public obligations. For example, they must also carry, on request, the signals of all other television broadcast stations in the same local market. 47 U.S.C. § 338(a)(1). *See Satellite Broad. and Commc'ns Ass'n v. FCC*, 275 F.3d 337, 352-66 (4th Cir. 2001) (rejecting First Amendment challenge). Additionally, all satellite providers must set aside four to seven percent of their channel capacity for "noncommercial programming of an educational or informational nature." 47 U.S.C. § 335(b);

*see also Time Warner Entm't Co. v. FCC*, 93 F.3d 957, 973-77 (D.C. Cir. 1996) (per curiam) (rejecting First Amendment challenge), *reh'g en banc denied*, 105 F.3d 723 (D.C. Cir. 1997). Finally, and particularly relevant to the case at hand, satellite service providers are required to treat all local television stations the same regarding picture quality. 16 F.C.C.R. 1918 ¶ 118 (2000).

The picture-quality condition was applied to HD programming in 2008 through an FCC rule. *See* 23 F.C.C.R. 5351, ¶ 5 (2008); 47 C.F.R. § 76.66 (k). Under that rule, satellite providers that carry *any* local stations in HD format in a particular market must carry *all* local stations in HD format. The regulation gives providers four years to meet the following implementation timetable: they must achieve compliance in fifteen percent of the markets in which they carry local channels in HD by Feb. 17, 2010; thirty percent by Feb. 17, 2011; sixty percent by Feb. 17, 2012; and one-hundred percent by Feb. 17, 2013.

The challenge is that HD consumes three to four times the channel capacity as standard definition (SD) programming. Because DISH currently lacks capacity to offer all local channels in HD, it prioritized local market television stations according to customer demand, and decided not to prioritize transmitting PBS in HD. Instead, DISH offered the major networks in HD and delayed offering PBS in HD except in Alaska and Hawaii, where it was legally obligated to do so. By comparison, its competitor DirectTV provided 106 channels of HD PBS in its regions of operation.

Congress determined that by forcing public broadcasting stations to the back of the HD priority line, DISH was jeopardizing public television's ability to compete with commercial television and thereby threatening the right of consumers "to receive federally funded programming broadcast by PBS." 156 Cong. Rec. E849-04 (daily ed. May 12, 2010) (speech of Rep. Anna G. Eshoo). In response, Congress enacted § 207 of

STELA to ensure "that satellite providers do not discriminate against noncommercial high definition signals" and to promote "an even playing field." *Id.*

The provision accelerates the HD timetable for "qualified noncommercial educational television stations." Under § 207, satellite carriers who take advantage of the statutory compulsory copyright license to provide local broadcasts in HD format must also provide "qualified noncommercial educational television stations located within that local market" in HD format. Carriers were given until December 31, 2010, to meet the requirement in fifty percent of the local markets in which they provide HD programming and until December 31, 2011, to comply fully in all remaining markets.

But Congress created an exemption to § 207 for satellite providers who entered into a private carriage agreement with at least thirty qualified noncommercial educational television stations. To avoid § 207's more burdensome timeline, DISH entered into such a contract. Doing so forced it to postpone launching HD services in ten new television markets. DISH then filed suit to enjoin § 207, arguing that it is a constitutionally impermissible content-based regulation of the company's First Amendment right to free speech.

The district court denied DISH's motion for a preliminary injunction without opinion. During the hearing, the court focused entirely on whether DISH was likely to succeed on the merits of its claim. The court concluded the regulation was content-neutral and not an infringement on DISH's First Amendment rights. It reasoned that § 207 "is designed to keep PBS competitive with other local outlets," not to regulate content. In summarizing its conclusions, the district court explained:

> [U]nder the case law we aren't dealing with content. You've got to offer PBS and now they're saying . . . you've got to offer it in HD so it's as attractive as

other local stations and I don't think it impinges or infringes the First Amendment.

We agree.

## II

We review a district court's grant or denial of a preliminary injunction for abuse of discretion and the underlying legal principles de novo. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). The grant or denial of a preliminary injunction lies within the discretion of the district court and we may reverse a district court only where it relied on an erroneous legal premise or abused its discretion. *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750 (9th Cir. 1982). To determine whether the district court abused its discretion, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 752 (citations omitted).

We have noted that "in some cases, parties appeal orders granting or denying motions for preliminary injunctions in order to ascertain the views of the appellate court on the merits of the litigation," but that due to the "limited scope of our review . . . our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits" and that such appeals often result in "unnecessary delay to the parties and inefficient use of judicial resources." *Id.* at 753. Thus, we offer our analysis with the necessary caveat that accompanies any preliminary injunction review—that this opinion is not an adjudication on the merits of DISH's claim. We conclude only that, based on our de novo review of the underlying legal principles, the district court did not abuse its discretion in finding that DISH is not likely to succeed.

### III

#### A

**[1]** To warrant a preliminary injunction, DISH must demonstrate that it meets all four of the elements of the preliminary injunction test established in *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008): that an injunction would be in the public interest, that without an injunction irreparable harm is likely, that the balance of equities tips in its favor, and that it is likely to succeed on the merits. *Id.* at 374. DISH argues that in the case of a First Amendment claim, all four of the *Winter* factors collapse into the merits. We have held otherwise.

While a First Amendment claim "certainly raises the specter" of irreparable harm and public interest considerations, proving the likelihood of such a claim is not enough to satisfy *Winter*. *Stormans,* 586 F.3d at 1138; *see also Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009) (even where the plaintiff was likely to succeed on the merits of his First Amendment claim, he "must also demonstrate that he is likely to suffer irreparable injury in the absence of a preliminary injunction, and that the balance of equities and the public interest tip in his favor") (citing *Winter*, 129 S. Ct. at 374).

Therefore, even if we were to determine that DISH is likely to succeed on the merits, we would still need to consider whether it satisfied the remaining elements of the preliminary injunction test. However, because we agree with the district court that DISH has failed to satisfy its burden of demonstrating it has met the first element, we need not consider the remaining three.

#### B

**[2]** To determine whether DISH is likely to succeed on the merits of its claim, we must first consider whether the First

Amendment likely applies. The Government argues that § 207 does not implicate the First Amendment because it does not constitute a serious infringement on DISH's editorial discretion. It suggests that the provision is merely a "modest alteration to the HD timetable" concerning only "the timing of a means of signal transmission[.]" The Government stresses that DISH is not challenging Congress's initial requirement that satellite carriers offer PBS in HD, only its timing, which does not rise to the level of a First Amendment burden.[2] Additionally, the Government argues that the First Amendment is not implicated because § 207 does not affect DISH's selection of channels or interfere with its expressive decisions.

DISH counters that § 207 does affect DISH's selection of channels because HD transmissions are offered on separate channels than SD transmissions and that if DISH carries PBS in HD, it cannot carry other stations in HD. Regarding the question whether the First Amendment applies to a provision that merely affects the timing of a requirement, DISH proposes that the accelerated pace unconstitutionally benefits PBS; the fact that the benefit lasts only three years is irrelevant.

The Supreme Court has recognized that cable television operators exercise " 'a significant amount of editorial discretion regarding what their programming will include.' " *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986) (quoting *FCC v. Midwest Video Corp.*, 440 U.S. 689, 707 (1979)). In *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) (*Turner I*), the Supreme Court applied intermediate scrutiny to a content-neutral regulation that required carriage of local broadcast stations on cable systems. In doing so, the Court announced that "laws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State . . . and so are always sub-

---

[2] DISH does not concede that the FCC's 2008 rule establishing the initial timetable is constitutional, but does not challenge it here.

2864         DISH NETWORK CORP. v. FCC

ject to at least some degree of heightened First Amendment scrutiny." *Turner I*, 512 U.S. at 640-41 (quoting *Arkansas Writer's Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987)).

**[3]** Section 207 does not affect DISH's ability to offer programs. It affects only when DISH can offer those programs in HD. Even so, *Turner I* instructs that any law that singles out an element of the press is subject to some form of heightened First Amendment scrutiny. For example, in *Turner I*, the Supreme Court determined that regulations that "impose special obligations upon cable operators and special burdens upon cable programmers" implicate the First Amendment. *Turner I*, 512 U.S. at 641. Applying that logic to the case at hand, while § 207's obligations and burdens on satellite carriers are minimal and nuanced, they do exist. Therefore, the First Amendment is likely implicated.

C

**[4]** Strict scrutiny applies to government actions that stifle or promote speech on account of its message. Such laws conflict with basic First Amendment principles valuing and protecting an individual's right to decide which ideas and beliefs are worth expressing, and almost always violate the First Amendment. *See id.* (acknowledging that "the First Amendment, subject to only narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals"). By contrast, regulations of speech unrelated to content are less likely to conflict with core First Amendment values, so they are subject only to intermediate scrutiny. *Id.* at 642.

DISH argues that we should apply strict scrutiny because § 207 is a content-based regulation of free speech. The Supreme Court has said that the "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys." *Ward v. Rock*

DISH NETWORK CORP. v. FCC    2865

*Against Racism*, 491 U.S. 781, 791 (1989); *see also Turner I*, 512 U.S. at 642. Generally, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner I*, 512 U.S. at 643 (internal citations omitted). Finally, even a statute that facially distinguishes a category of speech or speakers is content-neutral if justified by interests that are "unrelated to the suppression of free expression." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986).

DISH argues § 207 is content-based because:

(1) To be a "qualified noncommercial educational television station," a station must be eligible for a Corporation for Public Broadcasting (CPB) grant, and those grants are allocated according to certain content criteria.[3]

(2) Congress's motive in enacting § 207 was to promote subject matter it deemed "worthier." To support this contention, DISH highlights comments § 207's primary sponsor, Rep. Anna Eshoo, made announcing her personal preference for PBS programming over certain pay-per-view channels.[4]

---

[3]Specifically, applicants must devote the substantial majority of their daily total programming hours to "general audience programming that serves demonstrated community needs of an educational, informational and cultural nature." Programs that further the principles of "particular political or religious philosophies" do not qualify.

[4]DISH emphasizes parts of the following passage from Rep. Eshoo's remarks during a congressional hearing:

> My bill does not prevent satellite carriers from carrying any program. It merely mandates the carriage of all digital PBS programming, and I know . . . I have heard the argument before that you don't have enough room, enough space and that you would have to drop some. And I would suggest that you drop some of your

2866     DISH NETWORK CORP. v. FCC

(3) Strict scrutiny applies where Congress's preference is based on subject matter, regardless of whether it discriminates on the basis of viewpoint. Brief for Plaintiffs-Appellants at 36-37 (citing *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 509-10 (9th Cir. 1988))[5].

(4) Section 207's preference is reserved only for a subset of government-funded beneficiaries, so that "even the most educational, irreligious, apolitical station gets no preference if it is not currently on the Government dole."

First, the criteria used to determine whether a station receives federal funding are designed not to promote Congress's preference, but to guard against the influence of special interests. *Cf.* 127 Cong. Rec. 13,145 (June 22, 1981) (Rep. Gonzalez) (recognizing the need to "insulate public broadcasting from special interest influences—political, commercial, or any other kind."); H.R. Rep. No. 97-82, at 16 (1981) (noting the risk of "influence of special interests—be they commercial, political, or religious."). Furthermore, the CPB offers financial incentives for stations to differentiate their programming and the government is forbidden by law

---

  pay-per-view channels that carry soft porn. I would take PBS any day over soft porn so would you address yourself to the question as to why you refuse to negotiate a carriage agreement with public TV that provides for nondiscriminatory carriage in HD?

DISH also points out that during the same hearing, Rep. Eshoo remarked that "PBS is important in the life of the American people and I think what they do has already been set down and is a gold standard[.]"

[5]In *Bullfrog Films*, we found unconstitutional regulations implementing a multilateral treaty that exempted "educational, scientific and cultural" audio-visual materials from import duties. That case is distinguishable because it did not involve the broadcast regulatory environment, which the Supreme Court has analyzed in a separate First Amendment context. The broadcast regulatory environment differs from the film environment because satellite companies rely on having access to a regulated and scarce public resource and are subject to specific public obligations in return for a Copyright Act exemption that allows them to compete.

from exercising any direction, supervision, or control over the CPB.

**[5]** Section 207 "seeks to support expression, not suppress it," the Government maintains. The record supports that assertion. Rep. Eshoo may have expressed a personal preference for PBS over pay-per-view, but it does not follow that her personal preference is what drove Congress to enact § 207. The legislative record clearly indicates that in § 207 Congress aimed to prohibit satellite carriers from "discriminating" against noncommercial stations in a manner that interferes with "the rights of consumers to receive federally funded programming broadcast by America's Public Broadcasting Service, PBS." 156 Cong. Rec. E849-04 (daily ed. May 12, 2010) (speech of Rep. Anna G. Eshoo). The legislation sought to even the playing field and promote fair competition. DISH's contention that Congress enacted § 207 because Congress thinks PBS is better than commercial television contradicts the legislative record.

As for DISH's remaining arguments, *Turner I* is informative. In *Turner I,* the Supreme Court held that sections of the Cable Television Consumer Protection and Competition Act of 1992 requiring cable television systems to dedicate some of their channels to local broadcast television stations constituted a content-neutral restriction on speech, subject to intermediate scrutiny. *Turner I*, 512 U.S. at 661-62. The Court determined that the provisions were meant "to protect broadcast television from what Congress determined to be unfair competition" and that "[a]ppellants' ability to hypothesize a content-based purpose for these provisions rests on little more than speculation and does not cast doubt upon the content-neutral character of must-carry." *Id*. at 652.

As to the extent the regulations required cable carriers to carry noncommercial educational stations, those regulations were deemed content-neutral because "noncommercial licensees are not required by statute or regulation to carry any spe-

2868        DISH NETWORK CORP. v. FCC

cific quantity of 'educational' programming or any particular 'educational' programs." *Id.* at 651. The Court noted that the FCC and Congress have negligible influence over broadcast programming and may not use funding to the CPB to affect programming decisions. *Id.* at 651-52. During DISH's hearing, the Government's attorney reiterated that point:

> The government's funding is not specific as to the programming choice. It's actually done in a specific way so that the appropriations aren't even year to year, they're over a very long period of time. So the fact that the money comes from the government, the government has absolutely no control . . . over what kind of programming public television stations provide.

DISH argues that *Turner I* should be distinguished because the statute at issue in that case provided benefits to all full-power local television stations whereas the statute at issue here provides benefits only to public broadcasting stations, which must meet certain content requirements.

However, the Government has long supported public television stations and passed legislation benefitting them not because they broadcast specific content, but because the "economic realities of commercial broadcasting do not permit widespread commercial production and distribution of educational and cultural programs which do not have a mass audience appeal." H.R. Rep. No. 90-572, at 10-11 (1967). Congress supports public broadcasting because it fills "certain programming voids" and promotes diversity in programming. *Minority Television Project Inc. v. FCC*, 649 F. Supp. 2d 1025, 1033-34 (N.D. Cal. 2009); *see also* 47 U.S.C. § 396(a)(5) (recognizing that "[i]t furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, which will constitute an expression of diversity and excellence, and which will

DISH NETWORK CORP. v. FCC     2869

constitute a source of alternative telecommunications services for all the citizens of the Nation.").

**[6]** The satellite carriers benefit from the statutory copyright license established through SHVIA. In return, Congress may place reasonable limitations on the use of that license, which is all Congress has done here. It enacted § 207 to promote fair competition, not suppress free speech. Section 207 is content-neutral. *See Turner I*, 512 U.S. at 662.

D

**[7]** A content-neutral regulation will be sustained if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see also Turner I*, 512 U.S. at 662. A regulation need not be the least-restrictive means available as long as it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner I*, 512 U.S. at 662 (citing *Ward*, 491 U.S. at 799 (1989)). The question is not whether Congress was correct to determine that a particular statute was necessary, but whether its determination was reasonable and based on substantial evidence. *Turner I*, 512 U.S. at 666 (citing *Century Commc'ns Corp. v. FCC*, 835 F.2d 292, 304 (D.C. Cir. 1987)).

**[8]** The Supreme Court has recognized that "[T]he Government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment." *Turner I*, 512 U.S. at 664. The Court has also recognized that "assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* at 663. The

2870　　　　Dish Network Corp. v. FCC

question here is whether § 207 advances that interest in a manner that is not substantially more restrictive than necessary.

**[9]** In support of its position that Congress's pro-competitive determination was unreasonable, DISH cites its expert's declaration concluding that a delay in providing PBS in HD would not cure any threat to the viability of local PBS stations. The Government argues that because of the nature of public television funding, a delay in carrying public television in HD would indeed compromise the financing mechanism on which public broadcasting stations depend. As the Government's attorney explained at argument before the district court: "[I]f [satellite carriers are] going to go in and show ABC, or CBS, or FOX, they also need to go in and show PBS just over the intervening three years so that when we get to the point where everyone is broadcasting in HD that PBS isn't so far behind the local networks."). As most PBS supporters know, while Congress provides some financial support for public broadcasting through grants, most comes from other sources, and the stations' daily operations depend on donations from local viewers. Congress enacted § 207 because it feared that failure to keep up with enhancements in commercial signals and picture quality would impair the ability of public television stations to compete for viewers.

To further emphasize the reasonableness of Congress's action, the Government cites a *New York Times* article stating that shortly before STELA's passage, half of the country was watching television in HD format and that "HD may limit the number of channels that viewers turn to, because once they can watch programs in HD, they have little desire to watch anything of a lower quality." Brian Stelter, *Crystal-Clear, Maybe Mesmerizing*, N.Y. Times, May 24, 2010, B4. The Government also highlights an FCC report noting that "subscribers do not consider SD programming to be an acceptable substitute for HD programming."

**[10]** Considering the record before us and that Congress recognized whether a program is offered in HD affects whether viewers watch it (a fact DISH concedes by the very nature of its argument), it was reasonable for Congress to conclude that allowing satellite carriers to delay offering PBS in HD would lead to anticompetitive results. The Government would likely succeed at trial in demonstrating that Congress made a reasonable determination based on substantial evidence when it determined that § 207 was necessary to promote this substantial interest.

Arguing the regulation is substantially more restrictive than necessary, DISH proposes that the Government could satisfy any interest it might have simply by "providing adequate funds to public stations that could make HD carriage financially attractive." It also suggests that the public can easily access public broadcasting in HD by "hooking up rabbit ears and flicking a switch."

As for the first argument, PBS receives congressional support in part because by its very nature it is *not* commercially attractive. DISH's suggestion that instead of passing legislation Congress should spend money making PBS more attractive to commercial enterprises undercuts the very purpose that has driven decades of legislation promoting diversity in television programming.

In response to the second argument, DISH's own marketing materials demonstrate that many residents of areas with weak broadcast signals cannot receive over-the-air transmissions. For example, one DISH advertisement reads: "Because satellite technology is not limited by geographic area or land-based cable lines, you can receive DISH Network service no matter where in the nation you live. In fact, if you live in a rural area or on an RV, satellite TV is probably your only option." Similarly, a DISH Network press release reads: "DISH serv[es] the many rural markets that lack vital local TV signals."

| 2872 | DISH NETWORK CORP. v. FCC |
|---|---|

**[11]** We conclude that the district court did not abuse its discretion in determining that DISH failed at this stage of the proceedings to demonstrate that § 207 would likely not survive intermediate scrutiny. The provision is not substantially more restrictive than necessary to address Congress's reasonable fear that without action, DISH's decision to deprioritize PBS would jeopardize the ability of public broadcasters to compete with commercial stations.

## IV

Because we conclude that the district court did not abuse its discretion in determining that DISH failed to demonstrate at this stage that it is likely to succeed on the merits of its claim, we decline to consider the remaining three elements of the preliminary injunction test. The district court did not abuse its discretion in denying DISH's motion for a preliminary injunction.

AFFIRMED.